# FILED

**AUG 0 3 2011**

PATRICK E. DUFFY, CLERK

By_____
DEPUTY CLERK, MISSOULA



## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MONTANA

## MISSOULA DIVISION

| | | |
|---|---|---|
| DEFENDERS OF WILDLIFE, et al., | ) | CV 08-14-M-DWM |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | ORDER |
| | ) | |
| H. DALE HALL, et al. | ) | |
| | ) | |
| Defendants, | ) | |
| and | ) | |
| | ) | |
| SAFARI CLUB INTERNATIONAL, et al., | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |

## I. Introduction

The issue of wolf management has been heavily litigated in this court and

others.[1]  Plaintiffs filed this case on January 28, 2008.  In April 2009, the case was stayed while multiple groups challenged the United States Fish & Wildlife Service's decision to designate and partially remove protections from the Northern Rocky Mountains Gray Wolf Distinct Population Segment under the Endangered Species Act ("ESA"), 16 U.S.C. § 1536.  On August 5, 2010, the delisting rule was vacated for the reasons set forth in that opinion and order.  Defenders of Wildlife v. Salazar, 729 F.Supp. 2d 1207 (D. Mont. 2010).  Following that decision, the stay in these proceedings was lifted.

In the meantime, before a final decision in this case could be rendered, Congress passed and the president signed H.R. 1473, the Department of Defense and Full Year Continuing Appropriations Act of 2011.  Section 1713 of this Act directs the Service to reissue the delisting rule this Court had earlier vacated.  That in turn has given rise to two new cases challenging the constitutionality of Section 1713, and also prompted the Defendants to file a motion to dismiss this case claiming congressional action robs this Court of jurisdiction.  The Court recently

---

[1]The parties are familiar with the litigation history surrounding the Fish and Wildlife Service's effort to delist all or part of the northern Rocky Mountain gray wolf distinct population segment, which is set forth in greater detail in Defenders of Wildlife v. Salazar, 729 F.Supp. 2d 1207 (D. Mont. 2010), Defenders of Wildlife v. Hall, 565 F.Supp. 2d 1160 (D. Mont. 2008), and Wyoming v. U.S. Department of the Interior, 2010 WL 4814950 (D. Wyo. Nov. 18, 2010).  Wolf management was also litigated in U.S. v. McKittrick, 142 F.3d 1170 (9th Cir. 1998) and Wyoming Farm Bureau Federation v. Babbitt, 199 F.3d 1224 (10th Cir. 2000).

issued an order rejecting the constitutional challenge to Section 1713, see Doc.

No. 86 in Alliance for the Wild Rockies v. Salazar, CV 11-70-M-DWM (D. Mont.

August 3, 2011), leaving intact the delisting rule issued on May 5, 2011.

It is now necessary to resolve the issues in this case, or dismiss them for

lack of jurisdiction if such dismissal is warranted, because this case was the first in

the long and continuing series of contentious claims over wolf management.

Presently pending are cross motions for summary judgment, the Federal

Defendants' motion to dismiss, and a motion to strike an extra record exhibit. For

the reasons set forth below, the Plaintiffs' ESA claims are dismissed for lack of

jurisdiction because they are not yet ripe. Plaintiffs' motion for summary

judgment is denied and the Defendants' motion for summary judgment is granted

as to the NEPA claims.

## II.  Factual Background

In 1995 and 1996, the Fish and Wildlife Service reintroduced wolves into

portions of Idaho, Montana, and Wyoming. 73 Fed. Reg. at 4,721 (January 28,

2008). The authority for the wolf reintroduction is found in Section 10(j) of the

ESA. 16 U.S.C. § 1539(j). Under Section 10(j) the wolves of the northern Rocky

Mountains were designated a nonessential experimental species. 59 Fed. Reg

60,252 (Nov. 22, 1994).

Section 10(j) of the ESA is a way to provide greater management flexibility to those charged with the reintroduction of a species on an experimental basis. U.S. v. McKittrick, 142 F.3d 1170, 1174 (9th Cir. 1998) ("Congress' specific purpose in enacting section 10(j) was to give greater flexibility to the Secretary.") (quoting H.R.Rep. No. 97–567, at 33 (1982)). The Fish and Wildlife Service promulgates special rules to govern management of 10(j) species. 16 U.S.C. § 1533(d); 50 C.F.R. § 17.82 (2008). The regulations governing the management of the nonessential experimental wolves of the northern Rocky Mountains are the subject of this lawsuit.

On January 28, 2008, the Service published revisions to the rules governing the nonessential experimental wolves of the northern Rocky Mountains. AR 3571–3572. The 2008 Rule modifies the conditions under which states and tribes are permitted to take wolves to address unacceptable impacts to ungulate populations. Id. The earlier 2005 Rule permitted lethal take of wolves only when wolf predation was the *primary cause* of ungulate populations or herds not meeting state or tribal management goals. AR 3197. The 2008 amendments refined the definition of "unacceptable impact" so that wolves may be removed when they are "one of the *major causes* of the population or herd not meeting established state or tribal management goals." AR 3587 (emphasis added). The

-4-

modification was made, according to the Service, because the 2005 Rule set an unattainable threshold that did not provide the intended management flexibility. AR 3572.

On July 6, 2007, the Service published the proposed revisions to the 2005 rule in various media and at the same time solicited public comment. AR 7313-7320; 72 Fed. Reg. 36,942 (July 6, 2007); 73 Fed. Reg. at 4,724. Again on September 11, 2007, the Service opened an additional 30-day comment period for interested parties to comment on the proposed revisions and a draft environmental assessment. AR 7035-7036. 72 Fed. Reg. 51,770 (Sept. 11, 2007). Plaintiffs in this case submitted comments opposing the proposed rule change. On January 16, 2008, after having reviewed the environmental assessment, the Service then published a finding of no significant impact and the final environmental assessment. AR 555; 3571. Because other matters of greater urgency to the parties arose after the 2008 Rule became final, this case was stayed in the hope that resolution of the other cases would resolve the heated legal disputes between and among the various litigants. Alas, anticipation seems to be the greater part of hope when it comes to environmental disputes.

## III. Analysis

### A. Justiciablity

The Federal Defendants challenge the Court's jurisdiction, arguing the case should be dismissed because it is moot, unripe, and the Plaintiffs lack standing. These challenges have been narrowed and focused by the passage of Section 1713 of the Department of Defense and Full Year Continuing Appropriations Act of 2011 and the delisting rule issued on May 5, 2011. Under Section 1713, the Plaintiffs' claims are moot as to wolf populations in Montana and Idaho, as those populations are no longer listed under the ESA.[2] 76 Fed. Reg. 25590 (May 5, 2011). The only remaining wolves who might potentially be affected by the challenged 2008 10(j) rule are in three or four packs located on Wyoming's Wind River Indian Reservation.[3] Accordingly, the analysis of the Federal Defendants' jurisdictional challenges must be confined to the effects of 2008 10(j) rule as applies to management of the wolf populations on the Wind River Indian Reservation.

---

[2]Because the Plaintiffs' claims are moot as it relates to the delisted wolf population in Idaho, the Defendants' motion to strike Idaho's September 24, 2010, wolf management proposal (Doc. No. 101) is denied as moot.

[3]All other wolves in Wyoming are governed by the 1994 10(j) rule. 74 Fed. Reg. 15123, 15184 (Apr. 2, 2009).

### 1. Jurisdiction Under the ESA's Citizen Suit Provision

The Federal Defendants argue this court lacks jurisdiction over Plaintiffs'

claim that the 2008 Rule violates the ESA's duty to conserve the wolf population.

They argue Plaintiffs rely only on the ESA's citizen suit provision to provide

jurisdiction for the ESA claims. The argument is misplaced because the Plaintiffs

have alleged jurisdiction under both the Administrative Procedure Act ("APA")

and the ESA's citizen suit provision. Pls.'s 1st Amend. Compl. ¶ 6 (Oct. 16, 2008)

(Doc. No. 51). Even if Plaintiffs' Amended Complaint is not reviewable under the

ESA's citizen suit provision, it is reviewable under the APA. See 5 U.S.C. §§

701–706; Lujan v. National Wildlife Federation, 497 U.S. 871, 882–883 (1990).

The ESA's citizen suit provision allows citizens to sue in three

circumstances. In relevant part, the ESA states:

any person may commence a civil suit on his own behalf—

> (A) to enjoin any person, including the United States and any other
> governmental instrumentality or agency (to the extent permitted by
> the eleventh amendment to the Constitution), who is alleged to be in
> violation of any provision of this chapter or regulation issued under
> the authority thereof; or

> (B) to compel the Secretary to apply, pursuant to section
> 1535(g)(2)(B)(ii) of this title, the prohibitions set forth in or
> authorized pursuant to section 1533(d) or 1538(a)(1)(B) of this title
> with respect to the taking of any resident endangered species or
> threatened species within any State; or

> (C) against the Secretary where there is alleged a failure of the
> Secretary to perform any act or duty under section 1533 of this title
> which is not discretionary with the Secretary.

16 U.S.C. 1540(g)(1)(A).

Subsections (A) and (B) are not so broad as to authorize Plaintiffs to

complain that the 2008 regulations violate the ESA conservation mandate. The

Supreme Court explained in Bennett v. Spear that subsection (A) was never

intended to enable citizens to sue the Secretary or his delegates for failure to

perform duties as administrator of the ESA. 520 U.S. 154, 173 (1997). In an

analogous vein, Plaintiffs cannot sue under subsection (B) because that subsection

permits citizens to compel the Secretary to apply the take prohibitions of the ESA,

and in this case plaintiffs have not alleged an illegal take. See 16 U.S.C. §

1540(g)(1)(B).

One district court in the Ninth Circuit held that subsection (C) does not

authorize a challenge of agency action that allegedly violates the conservation

mandate of the ESA. Defenders of Wildlife v. Tuggle, 607 F.Supp. 2d 1095, 1118

(D. Ariz. 2009). A review of the rule to determine if it violates a conservation

mandate would require a review of the content of the rule. Subsection (C) allows

citizens to compel discrete actions, not to challenge the substantive content of the

-8-

Service's actions. Coos Co. Bd. Co. Commrs. v. Kempthorne, 531 F.3d 792, 811 (9th Cir. 2008).

Here, Plaintiffs challenge the content of the regulations, not a failure to perform a discrete action. As a consequence, the citizen suit provision 16 U.S.C. § 1540(g)(1)(C) does not authorize Plaintiffs to challenge the 2008 regulations for violating a conservation mandate.

That is not the end of the inquiry. When a statute does not provide for a private right of action, the APA creates a cause of action for someone aggrieved by agency action. 5 U.S.C. §§ 701–706; Lujan v. Natl. Wildlife Fedn., 497 U.S. 871, 882–883 (1990). A court may hold unlawful and set aside agency action under § 702 of the APA. In this case the proper avenue of review is the APA because Plaintiffs' ESA claims are not appropriately brought under 16 U.S.C. § 1540.

## 2. Ripeness

The Federal Defendants argue the Plaintiffs' claims are not ripe as to the Wind River Indian Reservation because the tribes have not submitted a wolf removal plan under revised 2008 10(j) rule and there is no indication that they have any plans to do so in the future.

The ripeness doctrine seeks to "prevent the courts, through avoidance of

-9-

premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." Abott Labs. v. Gardner, 387 U.S. 136, 148 (1967), overruled on other grounds, Califano. v. Sanders, 430 U.S. 99, 97 (1997).

The Court "must evaluate both the fitness of the issue for judicial decision and the hardship to the parties of withholding court decision." Id. at 149. Thus, a reviewing trial court "must consider: (1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." Ohio Forestry Ass'n, Inc. v. Sierra Club, 523 U.S. 726, 733–733 (1998).

### a. NEPA Claims

Plaintiffs can bring NEPA claims even before the Service approves site-specific plans. NEPA guarantees procedures, not results. See 42 U.S.C. § 4332 (requiring that agencies prepare environmental impact statements where major agency action would significantly affect the environment); Ohio Forestry, 523 U.S. at 737. When the violation of a NEPA procedure is alleged, the claim can

"never get riper." Id. In this case, Plaintiffs' NEPA claims are ripe for review.

### b. ESA Claims

In Ohio Forestry the Supreme Court held the challenge to a forest-management plan was not ripe because at the time of review, no projects based on the logging standards had been approved. 523 U.S. at 733–734. The forest-management plan designated areas as open to logging. But the plan did not give anyone legal right to cut trees, nor did it abolish anyone's legal authority to object to trees being cut. Id. at 726. The Ohio Forestry court also reasoned judicial review directed at the lawfulness of the plan would hinder agency efforts to refine its policy. Id. at 727. An agency can refine its policy by actual revisions of a plan or through prudent application of a plan in practice. Finally, according to Ohio Forestry, review was premature because without the benefit of a particular logging proposal, the court would be engaged in abstract review that the ripeness doctrine seeks to avoid. Id.

Plaintiffs argue that the inherent delay in litigation and the irreparable nature of environmental impacts create hardships that make this case ripe. In Center for Biological Diversity v. Kempthorne the Service promulgated regulations that authorized non-lethal take of polar bears and Pacific walrus over a five year period. 588 F.3d 701, 705 (9th Cir. 2009). In that case, the Ninth Circuit

stated the question of "whether an agency action is arbitrary and capricious is a legal question that would not benefit from further factual development." Id. at 708. The Circuit did not distinguish its case from Ohio Forestry, but the facts differed because the Service had issued letters of authorization under the regulations by the time the case was before the court. With the letters of authorization issued, judicial review did not rob the Service of the opportunity to refine its policy. The five year temporary regulations also created circumstances where delay created unique hardship. Id. at 709.

This case is analogous to Ohio Forestry. The ESA claims alleged in the Amended Complaint are not ripe because the tribes have not submitted a wolf removal plan and show no intention of doing so. The 2008 10(j) rule does not authorize the killing of any wolves and it does not interfere with anyone's opportunity to comment on a proposed wolf removal plan before it is approved and takes effect. The outcome might be different if, as was the case with the Idaho wolf population prior to delisting, a tribe had submitted a wolf removal proposal and in its draft environmental assessment the Service expressed that the preferred alternative is to approve. In the absence of such a proposal, the Court is left with an abstract dispute, the premature resolution of which would deny the Court the benefit of further factual development and could interfere with further

administrative attempts to refine the policy.

Due to the passage of Section 1713 and the issuance of the May 5, 2011 delisting rule, Plaintiffs' ESA claims (Counts I and II) are not ripe. Accordingly, those claims are dismissed for lack of jurisdiction.

### 3. Standing

The Federal Defendants argue that Plaintiffs lack standing in this case because at the time Plaintiffs filed suit, they had not identified members who stood to suffer a particularized injury to their desire to view and enjoy wolves on the Wind River Indian Reservation.

Article III standing means that: (1) the plaintiff has suffered "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. Allen v. Wright, 468 U.S. 737, 738 (1984). The interest that individual members have in observing a species, "whether those individuals are motivated by esthetic enjoyment, an interest in professional research, or an economic interest in preservation of the species" is sufficient to confer standing. Lujan v. Defenders of Wildlife, 504 U.S. 555, 582 (1992) (Stevens, J., concurring).

-13-

In this case Plaintiffs have standing to bring their NEPA challenge because they have identified two members who have an interest in the wolves on the Wind River Indian Reservation and have stated ripe claims for procedural injuries covered by NEPA. See Doc. Nos. 150-1 and 150-2. The Federal Defendants complain that these members are identified in declarations that were only recently filed with the Court, and cannot be relied upon to establish standing. The Defendants cite Wilderness Soc., Inc. v. Rey for the proposition that standing "depends on the facts as they exist when the complaint is filed." 622 F.3d 1251, 1257 (9th Cir. 2010) (quoting Newman-Green, Inc. v. Alfonzo-Larrain, 490 U.S. 826, 830 (1989)). Plaintiffs made allegations sufficient to establish standing at the time this action was filed. The ground has shifted under them since that time, and in response to the Federal Defendants' new challenge based on Section 1713, they have come forward with affidavits that, while only recently filed, establish that their members had an interest in observing wolves on the Wind River Indian Reservation at the time this action was filed.

The 2008 regulations broaden the circumstances under which wolves can be killed—making the killing of wolves more likely. Members of Plaintiffs' organizations insist they have plans to visit and recreate in areas where wolves are present, and they reasonably claim their enjoyment of these areas is threatened by

the challenged regulation. See e.g. 2nd Decl. Gary Macfarlane ¶ 8 (Aug. 20, 2010) [Doc No. 81-2]; Decl. Jonathan Marvel ¶¶ 6–7 (Jan. 27, 2009) [Doc. No. 64-8]. The claimed injury is fairly traceable to the agency's amendments to the regulations, and that injury would be redressed by granting the requested relief. Standing as to the NEPA claims does not require waiting until the Service approves site specific plans.

### 4. Mootness

The Federal Defendants have argued that the passage of Section 1713 and the issuance of the May 5, 2011 delisting rule make this case moot. That argument fails because the Amended Complaint makes allegations that can be fairly read to cover the Wind River Indian Reservation.

There is another potential ground for finding the case moot that merits discussion. This case presupposes the existence of 10(j) populations in the Central Idaho and Greater Yellowstone areas. That assumption appears to be at odds with representations of genetic exchange and geographical connectivity that the government has made to this Court in related litigation. In an Order dated January 28, 2011, the parties were instructed to file briefs "showing cause why the case should not be dismissed as moot due to the absence of a population meeting the statutory requirements for 10(j) status." Doc. No. 106 at 8. For the reasons that

-15-

follow, I conclude that dismissal on jurisdictional grounds is unwarranted, and that it is appropriate to decide the issues on the merits as framed by the parties, and not by the Court.

The doctrine of mootness ensures that there remains a case or controversy throughout the duration of the legal proceeding, requiring at all times that the plaintiff "must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." Spencer v. Kemna, 523 U.S. 1, 7 (1998) (quoting Lewis v. Continental Bank Corp., 494 U.S. 472, 477 (1990)).

This case is not moot so long as there is a genuine legal dispute between the parties and there is an available remedy. Both criteria are met here. There is a live dispute between the Plaintiffs and the agency over the legality of the 2008 revisions to the 10(j) regulations. The revised regulations pose a legitimate threat to the Plaintiffs' members' stated interest in the enjoyment of wolves as part of the natural landscape because the revisions make it easier for states to kill wolves to protect ungulate populations. An effective remedy is available through the power to enjoin the agency's implementation of the revisions to the 10(j) regulations and reinstate the pre-2008 regulations. Under these circumstances the case is not moot, regardless of whether the designated experimental populations presently

meet the statutory requirements of Section 10(j).[4]

At the March 24, 2011, hearing, Counsel for the non-settling Plaintiffs[5] argued that while the Court should refrain from dismissing the case as moot on jurisdictional grounds, questions regarding the continued applicability of Section 10(j) can be addressed through other avenues. Specifically, Counsel for the non-settling Plaintiffs suggested the Court could strike down the agency's Section 10(j) rules in their entirety on the ground that they are an invalid exercise of agency rule making in the absence of applicable statutory authority. The problem with resolving the case in that manner is that it would require the Court to vindicate a claim that the Plaintiffs have not pled; the Amended Complaint contains no count alleging that the agency's Section 10(j) regime is invalid due to the absence of a statutory predicate for management of an experimental population. Nor has there been any agency action regarding that issue, one way or another.

Consequently the Court will proceed to the merits of the NEPA claims as

---

[4]This finding rests on the narrow grounds of the constitutional mootness doctrine, and should not be viewed as an endorsement of any of the arguments presented by any party in response to the Court's Show Cause Order.

[5]The "non-settling Plaintiffs" are those Plaintiffs, common to this action and <u>Defenders of Wildlife v. Salazar</u>, CV 09-77-M-DWM, who are not parties to the proposed settlement presented to the Court in the latter case (<u>see</u> Doc. Nos. 187-189, CV 09-77-M-DWM).

framed by the parties' motions for summary judgment because the legal issue of whether or not a population may lose its experimental status as a matter of law, or instead only through agency action, is not properly before the Court.

## C.    Legal Standards

### 1.    Summary Judgment

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is a particularly appropriate tool for resolving claims challenging agency action. See Occidental Eng'g Co. v. INS, 753 F.2d 766, 770 (9th Cir. 1985). Summary judgment is appropriate in this case because the issues presented address the legality of Defendants' actions based on the administrative record and do not require resolution of factual disputes.

### 2.    Standard of APA Review

The APA authorizes lawsuits by a "person suffering legal wrong because of agency action, or [who is] adversely affected or aggrieved by agency action within the meaning of the relevant statute." 5 U.S.C. § 702. "Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704.

Judicial review of an agency's compliance with the ESA and NEPA are

-18-

governed by the judicial review provisions of the APA. City of Sausalito v. O'Neill, 386 F.3d 1186, 1205 (9th Cir. 2004); Native Ecosystems Council v. USFS, 428 F.3d 1233, 1238 (9th Cir. 2005). Agency decisions can be set aside under the APA if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402 (1971) (quoting 5 U.S.C. § 706(2)(A), overruled on other grounds by Califano v. Sanders, 430 U.S. 99 (1977)). [The] review must not rubber-stamp . . . administrative decisions that [the court deems] inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." Ocean Advocates v. U.S. Army Corps of Engrs., 361 F.3d 1108, 1119 (9th Cir. 2004) (internal citations and quotations omitted). Review under the arbitrary and capricious standard is "narrow," but "searching and careful." Marsh v. Or. Natural Res. Council, 490 U.S. 360, 378 (1989).

Idaho argues the "no set of circumstances" standard of review applies because Plaintiffs mount a facial challenge of a regulation. Courts apply the "no set of circumstances" standard in constitutional challenges. See United States v. Salerno, 481 U.S. 739 (1987); Wash. St. Grange v. Wash. St. Republican Party, 552 U.S. 442, 449 (2008). As Plaintiffs do not raise a constitutional challenge, the "no set of circumstances" standard does not apply.

## D. NEPA Claims (Counts III and IV)

Counts III and IV of the Amended Complaint involve alleged violations of NEPA. NEPA has a twofold goal: to "ensure the agency will have detailed information on significant environmental impacts when it makes its decisions" and to "guarantee that this information will be available to [the public]." Inland Empire Pub. Lands Council v. U.S. Forest Service, 88 F.3d 754, 758 (9th Cir. 1996). NEPA "does not mandate particular results, but simply describes the necessary process that an agency must follow in issuing an [environmental impact statement]." Westlands Water Dist. v. U.S. Dept. of Interior, 376 F.3d 853, 865 (9th Cir. 2004) (quotation omitted). In reviewing agency action under NEPA, a district court may not substitute its judgment for that of the agency. Id. Rather, the "focus must be on ensuring [the agency] took a 'hard look' at the environmental consequences of [its] decision[]." Id.

NEPA imposes procedural requirements. It requires federal agencies to prepare an environmental impact statement whenever they propose to undertake any "major Federal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). An agency may prepare an environmental assessment to determine whether an environmental impact statement is necessary. 40 C.F.R. § 1508.9. An environmental assessment is "a concise public document

-20-

for which a Federal agency is responsible that serves to [b]riefly provide sufficient

evidence and analysis for determining whether to prepare an environmental impact

statement or a finding of no significant impact." Id. An agency that decides not to

prepare an environmental impact statement must submit a convincing statement of

reasons why the project will not have a significant impact. Blue Mounts.

Biodiversity Project v. Blackwood, 161 F.3d 1208, 1202 (9th Cir. 1998).

## 1. Did the Service Predetermine the Outcome of its NEPA Analysis?

Plaintiffs' first argument is that the Service predetermined the results of the

environmental assessment because it could not complete an environmental impact

statement and issue regulations in time for Wyoming to participate in post-

delisting wolf management.[6] Plaintiffs cite to correspondence and internal agency

briefings that set deadlines and anticipated the need to expedite processing of the

10(j) regulations. AR 10 (briefing paper giving date at which regulations must be

finalized if Wyoming is to be included in delisting); AR 17 (indicating need to

expedite preparation and processing of 10(j) regulations); AR 2255 (suggesting

need to keep to tight timeline).

Those alleging predetermination have a high hurdle to clear. It only occurs

---

[6]The 2008 rule was promulgated in conjunction with a rule delisting wolves in the NEP areas, See 73 Fed. Reg. 10,514. The promulgation of these two rules triggered Wyoming's approved post de-listing management plan. See Wyo. Stat. Ann. § 23-1-109.

-21-

when an agency has made "an irreversible and irretrievable commitment of resources" based upon a particular environmental outcome, prior to completing its requisite environmental analysis. See Metcalf v. Daley, 214 F.3d 1135, 1143 (9th Cir. 2000). In Metcalf v. Daley, the Ninth Circuit held agencies predetermined the NEPA analysis when they signed two agreements binding them to support a proposal before the completion of an environmental assessment and a finding of no significant impact. Id. at 1144. Predetermination was also found in Save the Yaak Comm. v. Block when the agency awarded construction contracts prior to the completion of environmental assessments, and by the time the biological assessment was prepared, construction had begun. 840 F.2d 714, 717–719 (9th Cir. 1988).

Establishing an internal deadline does not prove predetermination. In Friends of S.E.'s Future v. Morrison, the Ninth Circuit affirmed a holding that the preparation of a tentative operating schedule for planned timber supply did not commit the agency to a particular action. 153 F.3d 1059, 1063 (9th Cir. 1998). Likewise, an aggressive schedule for preparation of an environmental assessment did not demonstrate that the agency prejudged the outcome of the environmental assessment in Oceana, Inc. v. Locke. 725 F.Supp. 2d 46, 67 (D.D.C. July 23, 2010).

The documents Plaintiffs cite in this case are insufficient to demonstrate the Service prejudged the outcome of the environmental assessment. Unlike Metcalf and Save the Yak, here, the agency never contractually obligated itself to a preferred course from which there was no turning back. The cited documents do not establish that the Service foreclosed the possibility of an environmental impact statement. Setting internal deadlines is not the irretrievable commitment of resources needed for a court to conclude the Service predetermined the result of the environmental assessment.

### 2. Did the Service Take a Hard Look?

#### a. Shifting Management Objectives

Plaintiffs also claim the Service failed to take a "hard look" at the likely effects of the amendments to the regulations. They point out that states and tribes can alter their ungulate management objectives. The full extent of wolf killing was not analyzed, according to Plaintiffs, because the Service did not project impacts in circumstances where states or tribes change their ungulate management objectives.

Plaintiffs point to an amendment to a definition of "unacceptable impacts" in a Wyoming statute to support their argument that the Service should foresee that states will artificially change ungulate management objectives to open an

avenue for the maximum killing of wolves.

In reviewing an agency's decision not to prepare an environmental impact statement, the question is "whether the agency took a 'hard look' at the potential environmental impact of a project." Blue Mountains Biodiversity Project, 161 F.3d at 1212. An environmental assessment requires a certain amount of forecasting, but NEPA does not require "crystal ball" predictions. Vt. Yankee Power Corp. v. Natural Res. Def. Council, 435 U.S. 519, 534 (1978).

The environmental assessment here reflects a determination that the 2008 regulations will not have a significant impact on the wolves of the northern Rocky Mountains. The environmental assessment states "many ungulate herds and populations in Idaho, Montana, and Wyoming are at or above State management objectives and most of those below management objectives are most affected by factors other than wolves." AR 601. The analysis further reasoned, "[b]ecause the instances where wolves are one of the major causes of ungulate declines are fewer than those of livestock depredation, [which accounts for 9 % of wolf removals] we expect the annual percentage of wolves removed under the alternative would be below 9 percent." Id.

The Service did not act arbitrarily or capriciously when its analysis failed to account for effects from hypothetical changes to the states' or tribes' ungulate

management objectives. The agency could not reasonably foresee the number of wolves that may be killed as a consequence of changed ungulate management objectives.

Furthermore, the 2008 regulations ostensibly contain safeguards that prevent states from deliberately inflating ungulate management objectives to justify killing wolves. Wolf control proposals must state the basis for the ungulate management objectives. AR 3587. The science based proposal must include a description of the data indicating the ungulate population is below management objectives and how wolf control will help further the objectives. After public and peer review, the plan is subject to NEPA analysis. The Service can reject a proposal that it deems will impede wolf recovery. Id.

### b. Genetic Connectivity

Plaintiffs further insist that the environmental assessment did not take a "hard look" at the impacts on genetic exchange. They cite a case in which this Court found the northern Rocky Mountains gray wolf population had not achieved substantial connectivity and genetic exchange, and they argue lethal take will significantly impact genetic exchange. See Defenders of Wildlife v. Hall, 565 F. Supp. 2d 1160, 1172 (D. Mont. 2008). Plaintiffs argue the Service incorrectly assumed that wolf killing would not be widespread and that wolves will rapidly

recolonize areas from which they are removed. Plaintiffs contend widespread wolf

removal is likely because the 2008 10(j) regulations lack appropriate safeguards.

To the contrary, on this record, the regulations contain appropriate safeguards to

prevent such events from taking place.

The Service logically concluded that potential areas where wolves would be

removed would be limited and localized. AR 601. The environmental assessment

disclosed that limited areas exist where ungulate management objectives fall

below or risk falling below set standards. In only a fraction of those areas were

wolves a major cause of the failed objective. Therefore the agency anticipated

wolf removal would be discrete. Id.

In addition to numerical limits on the number of wolves that can be

removed, the following procedural safeguards apply:

(A) . . . the State or Tribes must prepare a science-based document that:

> (1) Describes the basis of ungulate population or herd management
> objectives, what data indicate that the ungulate population or herd is below
> management objectives, what data indicate that wolves are a major cause of
> the unacceptable impact to the ungulate population or herd, why wolf
> removal is a warranted solution to help restore the ungulate population or
> herd to State or Tribal management objectives, the level and duration of
> wolf removal being proposed, and how ungulate population or herd
> response to wolf removal will be measured and control actions adjusted for
> effectiveness;

> (2) Demonstrates that attempts were and are being made to address other

identified major causes of ungulate herd or population declines or the State or Tribe commits to implement possible remedies or conservation measures in addition to wolf removal; and

(3) Provides an opportunity for peer review and public comment on their proposal prior to submitting it to the Service for written concurrence. The State or Tribe must:

(i) Conduct the peer review process in conformance with the Office of Management and Budget's Final Information Quality Bulletin for Peer Review (70 FR 2664, January 14, 2005) and include in their proposal an explanation of how the bulletin's standards were considered and satisfied; and

(ii) Obtain at least five independent peer reviews from individuals with relevant expertise other than staff employed by a State, Tribal, or Federal agency directly or indirectly involved with predator control or ungulate management in Idaho, Montana, or Wyoming.

(B) Before the Service will authorize lethal removal, [the Service] must determine that an unacceptable impact to wild ungulate populations or herds has occurred. We also must determine that the proposed lethal removal is science-based, will not contribute to reducing the wolf population in the State below 20 breeding pairs and 200 wolves, and will not impede wolf recovery. AR 3587.

Additionally, "[w]olf removal . . . is limited in time until the ungulate herd

meets its management objectives or until it is evident that wolf removal is not

having a positive effect on the herd's status." AR 603. The environmental

assessment further explains "[i]f wolf densities and ungulate depredation return to

levels that cause the ungulate herd or population to decline below management

objectives again, the State or Tribe would need to submit another proposal . . . ."

-27-

Id.

The environmental assessment addressed the possible removal of entire

packs and concluded that wolves' high reproductive potential and tendency to

disperse and replace social vacancies meant that impacts would not be significant.

AR 601–603. Ultimately, the Service considered relevant factors and articulated a

rational connection to its decision. The Service took a hard look at the impacts on

genetic connectivity.

### c.    Site-Specific Impacts

Plaintiffs argue the Service was required to and ultimately failed to disclose

and analyze site-specific impacts of the 2008 10(j) regulations. Plaintiffs argue

the Service should have conducted site-specific analysis of the 2006 Clearwater

proposal as well as the ecological impacts of other foreseeable plans. Defendants

counter that the Service could not anticipate possible site-specific effects because

at the time of the environmental assessment, no wolf removal proposals had been

submitted under the 2008 10(j) regulations. Therefore, Defendants argue NEPA

did not require site-specific analysis of wolf populations or other ecological

impacts.

Plaintiffs rely on Kern v. U.S. Bureau of Land Management, which states

"an agency may not avoid an obligation to analyze in an environmental impact

statement] environmental consequence that foreseeably arise," and the NEPA analysis is meant to "evaluate the possibilities in light of current and contemplated plans . . . ." Kern v. U.S. Bureau of Land Mgt., 284 F.3d 1062, 1072 (9th Cir. 2002). The opinion continues to explain that when certain site-specific data is not available "[environmental impact statement] analysis may be more general than a subsequent environmental assessment analysis . . . ." The court ultimately disapproved the environmental impact statement because it deferred all analysis of a particular environmental concern. Id. at 1074.

The detailed and site specific information required in an environmental impact statement is not necessarily required in an environmental assessment. An environmental assessment is a "concise public document" that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9(a).

Other cases cited by Plaintiffs involve situations where immediate site-specific consequences were foreseeable and ascertainable. Anderson v. Evans, 314 F.3d 1006, 1021 (9th Cir.2002) (agency knew number of whales that would be taken, the timing, frequency and area of local impact); Blue Mountains Biodiversity Project v. Blackwood, 161 F.3d 1208, 1214 (1998) (five logging and

-29-

timber sales were "disclosed by name to a coalition of logging companies, along with estimated sale quantities and time lines even before . . . [environmental assessment] was completed."); Alaska Wilderness League v. Kempthorne 548 F.3d 815, 818 (9th Cir. 2008) (Service received exploration plan that detailed twelve exploratory wells on twelve lease tracts over three year period.); Fund for Animals v. Norton, 281 F. Supp. 2d 209, 232 (D.D.C. 2003) (Service authorized take of 525 swans).

In a programmatic environmental impact statement, site-specific impacts need not be evaluated until a critical decision has been made to act on the site development. Friends of Yosemite Valley v. Norton, 348 F.3d 789, 801 (9th Cir. 2003). The Service did not have to perform site-specific analysis in the environmental assessment because no wolf removal plans had been submitted. The 2006 Clearwater plan, cited by Plaintiffs, had been rejected under the 2005 regulations, and it was not before the Service when the environmental assessment was prepared. When a critical decision has not been made to act on a specific site, NEPA permits the Service to make more general forecasts on the impacts of the agency action. See id. Here, the Service made appropriate forecasts of the number of wolves that would be removed and the likely impact on the resilient population. AR 601–603.

The environmental assessment did not discuss site-specific ecological

impacts, but it considered potential ecological impacts from increased wolf

removal. According to the environmental assessment, in localized areas where

wolf removal results in high ungulate numbers and where plant communities are

vulnerable, an area may experience increased browsing pressure. AR 605.

Reduced habitat quality from overgrazing can affect other species, ultimately

creating a cascading ecological effect. In those areas where ungulates are not

meeting management objectives, information about the condition of woody

browse was not available. AR 600.

However, the Service had enough information to conclude that anticipated

wolf removal would not disrupt ecosystem functions or meaningfully impact other

species that benefit from wolf presence. The cascading ecological effects that

have been documented to follow overgrazing occur only when high numbers of

ungulates exist and the area has a vulnerable plant community. AR 605–606.

Areas where plant species are considered to benefit from the presence of wolves

(riparian habitat constitutes approximately 1 percent of the northern Yellowstone

Range) are rare. AR 600. If wolf removal occurs only in places where ungulate

populations are struggling, and wolf removal plans may be implemented only until

an "ungulate herd meets its management objectives" AR 603, then the Service

-31-

reasonably concluded that limited wolf removal will not significantly impact browsing pressure. The Service will have an opportunity to perform site-specific analysis of ecological impacts when wolf removal proposals are submitted.

### 3. Failure to Prepare an Environmental Impact Statement

Finally, Plaintiffs argue the Service violated NEPA by failing to prepare an environmental impact statement. Again, Plaintiffs' argument assumes that the 2008 regulation will permit the killing of more than 1,000 wolves. Additionally, Plaintiffs argue wolf removal can have a significant impact even if wolf control actions do not impede wolf recovery.

An environmental impact statement is necessary where an environmental assessment demonstrates a major federal action significantly affects the quality of the human environment. 42 U.S.C. § 4332(2)(C). "If an agency decides not to prepare an [environmental impact statement], it must supply a convincing statement of reasons to explain why a project's impacts are insignificant. The statement of reasons is crucial to determining whether the agency took a hard look at the potential environmental impact of a project." Blue Mounts. Biodiversity Project v. Blackwood, 161 F.3d at 1212 (quotations and citations omitted). An agency's decision not to prepare an environmental impact statement is reviewed under the arbitrary and capricious standard. Marsh, 490 U.S. at 376–377.

NEPA required the completion of an environmental impact statement in Anderson v. Evans because although the number of whales that would be taken would not impact the viability of the species as a whole, the Service did not know whether other whales would replenish the area where whales were hunted. 314 F.3d 1006,1020–1021 (9th Cir. 2002). Likewise, a court held the plaintiffs were likely to succeed in their challenge not to proceed with an environmental impact statement in Fund for Animals v. Norton, 281 F. Supp. 2d 209, 225 (D.D.C. 2003). As part of its criticism of the public comment period, the court noted the environmental assessment described the location of swan removal only as "17 States in the Atlantic Flyway." Id. at 227. Even though the number of swans would not impact the population as a whole, the court held Plaintiffs were likely to succeed in their claim because the individual swans rarely travel more than 30 miles from one location, and meaningful public participation required more detailed disclosure of known areas where the swans would be removed. Id. Anderson does not establish the necessity of an environmental impact statement here because of the difference in and knowledge about wolf biology. Unlike the whale population in Anderson, the Service has a science based proposition that wolf populations quickly expand to fill vacancies in suitable habitat. See AR 4773 (Bradley 2005, finding 70 percent recolonization rate after pack removed with 86

percent of recolonization occurring within one year).

The holding in Fund for Animals does not weigh in favor of requiring an environmental impact statement because the Service did not benefit from having specific wolf management plans before it. In contrast, the agency in Fund for Animals knew how many swans would be removed, and it had proposals with details on where the swans would be removed. 281 F. Supp. 2d at 228. Here, the Service's general forecasting was appropriate. Further, the Service did not arbitrarily estimate the number of wolves that would be removed. "No peer reviewer expressed concern that the revisions would result in significant impacts to the recovered [northern Rocky Mountain] wolf population or that the rule's safety margin is inadequate." AR 3578. The Service provided a convincing statement of reasons to explain why the amendments would not cause a significant impact. The Service did not act arbitrarily and capriciously when it decided not to prepare an environmental impact statement.

Because Plaintiffs have not shown a NEPA violation, the Defendants are entitled to summary judgment on Counts III and IV.

## IV. Conclusion

For the foregoing reasons, IT IS HEREBY ORDERED:

1.      Defendants' motion to strike (Doc No. 101) is DENIED as moot.

2. Defendants' motion to dismiss (Doc. No. 153) is GRANTED as to Counts I and II and DENIED as to Counts III and IV; Counts I and II are DISMISSED due to lack of jurisdiction.

3. Plaintiffs' motion for summary judgment (Doc. No. 81) is DENIED as to Counts III and IV.

4. Defendants' motions for summary judgment (Doc. Nos. 87, 89, 92, and 94) are GRANTED as to Counts III and IV.

5. The Clerk of Court is directed to enter judgment in favor of the Defendants and against the Plaintiffs in accordance with this Order, and to close the case file.

Dated this 3Rd day of August, 2011.

Donald W. Molloy, District Judge
United States District Court